Good morning, Your Honors. David Zugman on behalf of Jesus Navarro-Montes. I will attempt to reserve a couple minutes for rebuttal. Your Honors, I want to begin this by saying that I have the utmost respect for opposing counsel. I think he may be the best trial attorney we have at the United States Attorney's Office. And reviewing the transcript, it was clear to me how tough it must be to be a United States attorney because you have so much power in cases like this. And this was clearly a very important case to the government. But I don't think you can let a life-in-prison sentence stand on this trial. And the reason I think that is the errors that I've brought to the Court's attention, I hope, the eight errors, are significant. And they all skew in the same way, which is Mr. Navarro-Montes did not receive a fair trial. I began with the guilty plea argument, and I understand that. Comparatively, it's not the most important argument. But I think it demonstrates the unfairness that occurred during trial, that Mr. Navarro-Montes, the criminal defendant, was not allowed to say, yes, I pled guilty to these charges, this is the reason I was burned and I couldn't be used as a smuggler. But Macedonio-Guerrero was allowed to reduce his guilty plea, and the government used his guilty plea as a way to buttress his credibility. But I understand. I'm not going to get a reversal on that issue alone. I think, though, when you consider the identifications, I don't think there can be much doubt that defense counsel should have been allowed to explore the issue of double blind, that that is an obvious, important procedure to observe in conducting lineups. And the government had some fun with the fact that I pointed out that that is used in particle physics. It pops up all over the scientific arena. Indeed, you can't submit a paper in science without observing double blind procedures, if they can be observed, because it's a natural human bias. And Agent Stokes gives the absolute factual predicate that you would need to have a double blind problem, which is I closely monitor the person doing the identification. I watch their eyes. And Agent Stokes was the person who put together the lineup, who said that it was a good lineup, who was allowed to rebut the problems of double blind, even though defense counsel was not allowed to explore the problems of double blind. And the consequences. And just to make sure I understand, when you're talking about double blind, you're talking about the fact that the agent who conducted the photo spread, in this case, knew who the suspect was and what position within the photo spread the suspect was located. That is exactly right. When you say that defense wasn't allowed to explore that issue, what do we do with the fact that there wasn't an offer of proof made by the defendant? Yeah. It would have been better if defense counsel would have not given up on the issue when the court ruled. But the court did rule. The court said, look, this is a new procedure, which is not true. And I don't think it has bearing on this case, which is not true. Well, because of that lack of offer of proof, are we now limited to plain error review? It was in a defense counsel said, I want to talk to you about double blind. Objection sustained. I don't see how that can be plain error. There's an attempt to explore the issue, and there's an objection which is sustained. So it would be very difficult to institute plain error review on that. You know, the question I have on my mind is, was there, I understood the theory, the defense theory at trial to be that it wasn't him, that he was actually not present. Yes. Was it an argument in the alternative that even if it was him, that he couldn't have formed the analysis of forethought to have killed the agent given this situation? No. That argument was not made during, I wish it was. It seems to me very clear that this case is entirely about assuming that the government could prove at a trial that Mr. Navarro Montes was the driver. You know, there is some evidence in the record from which a jury could conclude that he was the driver, which is why I don't bring a sufficiency claim. Right. It's just a few seconds. And obviously, the driver, whoever it was, wasn't expecting to be spike-stripped. You wouldn't take the road that you were expecting to be spike-stripped on. And certainly, you wouldn't expect, and I must say, I mean, Mr. Aguilar's here, he seems like he was a really good guy, and it seems like this is a terrible, terrible thing that happened, and I don't wish to, it's a terrible loss for them. But it was really unusual that an agent would hold one end of the spike-strip. It also sounds pretty inept. I mean, it seems pretty inept by the agents. That argument wasn't made at trial. I read his entire testimony. I read both closing arguments. Yes. Yes, Your Honor. The first discussion that Mr. Lesher and I ever had about this case, I told him what I thought I would bring as the defense. You know, and that. Wait. Were you the trial lawyer? No. Okay. You would have made that alternative argument at trial? I don't know what to do with an alternative. Oh, I see what you're saying. Yeah. And Mr. Navarro-Montes pled guilty to the guilty plea he was not allowed to introduce. He was going to prison for, you know, at least five years off the bat, walking in the door. But the fact that he was even charged with that conduct never came before the jury. Is that right? Well, he admitted to it. He admitted to the conduct. Yes. But the fact that he was actually indicted on that charge never came in. Correct. That's part of the government's argument is that they didn't ever know about count one. I see a lot of problems with this trial. But tell me what your strongest argument is for reversal. I think I'm strong on Rothrock's vouching. I think that that is absolutely inexcusable. And there was just no – it was done without – there was no provocation by the defense to cause this sudden opinion. And it was done twice. It was confirmed that it was opinion testimony. And then this is symptom. This is – the curative instruction is labeled as curative, but it is not curative. Because he was not – the court – curiously, because I also read a lot of the other testimony where the court, when it would give a curative instruction in every other place, would tell the jury to disregard the evidence. But with the Rothrock curative instruction, the court didn't say that. It didn't say disregard the testimony that he's not aware – he hasn't come across any evidence, which could, of course, be evidence in the trial or evidence that wasn't admitted in the trial or evidence that – It wasn't true. It wasn't. The worst part is Carla Tapia and Nathan McDaniel both gave eyewitness IDs that didn't match. They didn't – they picked out somebody else in the lineup. Whatever – maybe it wasn't the most persuasive evidence, but that is evidence that points to someone else other than Mr. Navarro Montes. And it seems to me that the curative instruction indicated no judicial disapproval of the comments. In Simtom, it was clear that that's a key thing. You're supposed to say this is not something that you should be considering. It's not something a witness should be offering, opinion testimony about facts outside of the record. There's no disapproval, and there's no indication that that is inappropriate. And it absolutely was. And part of the problem, part of the advocacy in the case, in closing argument, the government used the term we. And it was a prosecution team. It was Mr. Lester and Mr. Robinson, two of their finest prosecutors. And we, at some points, referred to the fact that it was two people. But at other points, it was about the investigation. And this is an unusual case, not simply because of what was at stake, but the government lawyers actually participated in the interviews of witnesses. It was ---- Were there objections to the use of the term we? No. That's what I thought. No. And there wasn't an objection to the argument that you have to find a conspiracy against Mr. Navarro Montes, even though it seems to me that that's absolutely inappropriate. But I think that goes to, you know, there is an objection on Rothrock's testimony. This has got to be conceded error, because the judge gave a curative. We all ---- I mean, it seems clear that that testimony ought not have been given. And there's really an insufficient curative. So then the other facts and the reason I ---- or the other arguments, the reason I brought them, is they all buttress that position, that agent ---- that this case involved an unfair trial. If he were to be quiet, what would you do with all that testimony where he said he wasn't there? Yeah. I mean, we go through this a lot. And I would have to ---- I mean, it could be that Mr. Navarro Montes ordered defense counsel to pursue that strategy. I simply do not know. And maybe I would be forced to adopt the same strategy, but it would not be the strategy I would recommend. And so then, in a way, maybe a habeas is a better avenue. Possibly. But it is also the case that you have this objection to the vouching ---- I'm sorry, to the opinion testimony. It was problematic vouching. Yes. We have a lot of cases on that. Well, and you also have the bad ---- I mean, what I believe to be an insufficient jury instruction on the difference between recklessness and extreme recklessness. Your Honor's have ---- Did the defense propose any alternative instructions that the trial court rejected? No. It's plain error. No doubt about that. What is the difference between recklessness and extreme recklessness? Yeah. I mean, it is kind of an eye of the beholder sort of thing. But there's no effort to distinguish ---- I mean, especially in consideration of the verdict form. Because the verdict form, I think, is really problematic with this unclear difference between what is recklessness and what is extreme recklessness. Because, I mean, in my view and perhaps in many people's view, recklessness is always extreme. And that's what recklessness is. That is what distinguishes it from negligence. Isn't that the law? Yes. It's extreme ---- Now it's where that is extreme recklessness. Yes. And I think ---- It's not defined anywhere? I have not found cases. I have found cases that say that the instructions as given were insufficient. And that's the United States v. Paul case, where it's a very similar instruction. And there's no attempt to unpack the differences between what is recklessness and what is extreme recklessness. Do we have to find plain error on that? Do we apply plain error review to that one, too? Yes. And that's a rough one. But I think that, coupled with the verdict form being extremely unclear, when I first read the verdict form, I was aghast that it just doesn't make the choice clear between what is involuntary ---- What's unclear about it? It tracks the jury instructions. Because it says that it's a ---- It defines both involuntary manslaughter and murder as being parts of murder. There is no ---- It seems to me ---- I was confused when I read that. It doesn't seem to me to present a real choice between the two. Between involuntary manslaughter and murder? Yes. And how would you have done the verdict form? Well, I think that, luckily, the Case I-28 Jada Pineda-Dovall seems to indicate that you would need to have a jury instruction that says something more than merely reckless driving. I mean, I guess we can all concede that there are facts in the record that could show reckless driving in this case. But in Pineda-Dovall, I mean, that person also swerved around the spike strip. That person also had been previously attempted to use the spike strip on that person. He said to the passengers, Commend yourselves to God right before swerving around and having the accident. And in that case, this Court reversed the finding of second-degree murder. When you say in the verdict form that it doesn't present a choice, where's the law that requires the choice be presented? And here's specifically what I'm asking. When I read the verdict form, it says, Do you find for murder, yes or no? And if the answer is no, then you can consider, Do you find for involuntary manslaughter? What's wrong with that? Are you saying that the verdict form should have said, Jury, you may choose between murder, involuntary manslaughter, or neither? I think that the jury form should have made clear that they were making distinctions on essentially the mens rea. If you find that the defendant acted with, you know, malice, I mean, it goes to the jury instructions. Those two things go together. And they have to be read together, right? Yes, I believe so. I mean, I think under this Court's case law, the verdict form is a jury instruction. So that's why I think it's unclear as given. But, yes, there was no independent verdict form offered by the defense or different jury instructions offered by the defense. Because when the jury instructions lay it out and tells the jury how to consider the murder versus the lesser included, generally the government then asks for and the defense generally agrees for a fairly straightforward verdict form, right? So that you don't inadvertently open yourself up to errors by somehow contradicting the jury instructions. Well, here the problem is that we have overlapping mens reas. You know, the mens rea for manslaughter is recklessness. And the mens rea for second-degree implied malice murder is extreme recklessness. And there is no attempt to unpack what that means. So that's why I think that it's a big problem. I also wanted to flag that I still don't understand how the government can argue that they didn't show a benefit to cooperator Brenda Romero. I'm hoping that there will be an explanation today. A cold convoyed her in a sting operation in March of 2008, charged her with one ton of marijuana. I read the complaint. It seems like she confessed. That case was then dismissed two weeks later after the government had moved to detain her. And then she became a witness. They then had some problems with Ms. Romero while she was a witness. And they ended up paying her thousands of dollars. Thousands of dollars did come out of trial. But the benefit of this, what appears to be incredibly favorable treatment, never provided to the defense. It's not, I mean, the government's position is we didn't show her, we didn't give her immunity, and we just. What case do you have that supports that? Butler. Pardon me? United States v. Butler. That would be braiding material, right? Yes. Impeachment material. Yes. This is, I mean, and it's a huge benefit that was offered to a main cooperating witness. I mean, they've got her and they've got Macedonio Guerrero that are really the main people that say he's part of this organization. And there's this huge benefit that's given to Ms. Romero. And there's just, I flag it in the briefs and it's like, well, no, we just didn't. It was no big deal. We just let her go. You know, you mentioned the other government witness, Witness Guerrero. Your third argument is that there was error because the government limited the cross-examination of Mr. Guerrero. Where specifically in the transcript or the excerpt of record do I find the government's ruling? What was the government's ruling and where do I find that? Limiting the cross-examination. For Mr. Guerrero, the defense counsel attempted to subpoena, attempted pretrial to get the materials regarding the safety valve interview. Right. The government did not turn those over, I guess, plus the probation report to the judge. And then argued to the judge that because of 608, this material couldn't be used to impeach him anyway. And I think they're right in terms of the fact that he can't introduce any extrinsic evidence. They're stuck with whatever Macedonio Guerrero says. But you have to know the facts to be able to impeach him. It's not fair to say, hey, I lied. That's all you need to know. You don't need to know how splendidly or floridly I lied in the course of my safety valve. So it sounds like you're really making more of a discovery or production argument than a trial argument that the district because the way I first read your third argument, I thought you were arguing that the district court limited the cross-examination by not allowing the defense to ask certain questions. What I'm really hearing you say is the district court erred by not giving certain informational material to the defendant that would have permitted those questions. But the court said he read it in camera, and it was information the defense already had. And I wish that the record were clearer in this regard. But it seems to me that the court was persuaded by the government's interpretation of Rule 608, which I think is an incorrect interpretation. I think that the district court ruled that once you learn that he lied, that's all you get. That's all you need to know. I see I'm down to two minutes. Seek to reserve. May it please the Court. David Leshman of the United States. I respectfully and vigorously disagree with my colleague. Defendant Navarro Montes received a fair trial in the district court. Thirty-two witnesses testified in the government's case in chief, including eyewitnesses, members of the drug trafficking organization that Navarro Montes was working with, and Mexican authorities who testified regarding Navarro Montes' two statements shortly after Agent Aguilar's murder, wherein Navarro Montes admitted to running over Luis Aguilar with a Hummer in an effort to escape capture by law enforcement. Are you talking about the confessions? Yes, I am. Okay. Both confessions were provided first on January 22nd of 2008 and the second on January 23rd, 2008. And witnesses testified with respect to both convictions, Your Honor. Confessions, excuse me. Are you arguing that even if we find errors in some of these aspects, that there's no prejudice, that they're all harmless because of the confessions?  That is one piece of the evidence that was introduced at trial to demonstrate Navarro Montes' guilt of a drug trafficking conspiracy and murder. There was the eyewitness testimony. There was the testimony of members of the drug trafficking organization, including Mr. Guerrero, who testified for an entire day at trial, subject to vigorous cross-examination. And he, over the course of an entire day's testimony, laid out the workings of this drug trafficking organization and Defendant Navarro Montes' role as a load driver for that organization and specifically Defendant Navarro Montes' driving on January 19th, 2008. You say he was subject to vigorous cross-examination, but he wasn't subject to vigorous cross-examination on the specifics or particulars of his safety valve, of the alleged loss of the safety valve hearing, was he? Yes, he was, Your Honor. I appreciate the opportunity to clear up the record in that regard. There is no allegation raised in the opening brief that the government failed to comply with its discovery obligations. And, in fact, the government complied with them and went beyond them. I believe my colleague inadvertently misspoke regarding what the government produced with respect to Macedonio Guerrero. So, to be clear, the government produced to the defense a sentencing memorandum which described in detail Macedonio Guerrero's statements during the safety valve debrief and the reasons why the government believed that those statements were not truthful. And, in fact, the transcript clearly reflects that those materials were turned over. The issue was with respect to the pre-sentence report from that case. That was provided to Judge Anello in camera, and Judge Anello reviewed it and concluded that it was entirely cumulative of the material that was already in the defense possession. The defense was given all of the information necessary to impeach Macedonio Guerrero, and there was no stone left unturned. He admitted each instance in which he had been untruthful, and the defense had a full and fair opportunity to cross-examine him on that. So the basis for Judge Anello's decision not to provide it, provide the PSR to Navarro Montes, was that it was cumulative? It was. It was. The statement in the pre-sentence report regarding the way in which Macedonio Guerrero was untruthful during the safety valve debrief was entirely cumulative of the government sentencing memorandum. So was the defense ever given the opportunity to look at it? The pre-sentence report? No. That was reviewed in camera. The sentencing memorandum was. Okay. So you would think that the reason the judge would not turn it over would be that it contained sensitive information or something like that. If it was cumulative is the reason. That's not really a valid reason. I mean, you would think that he could reject, you know, exclude evidence that was cumulative, but to not provide a potential writing material because it was cumulative is not really a correct basis for a ruling. Even if the Court were to find that that ruling doesn't fit in, the fact is that there is no dispute that the defense had available to it a point by point summary of what Guerrero said during that particular safety valve interview and why it was incorrect. And keeping in mind that the probation, the PSR summary of that would have been drawn entirely from the. How do we know that? I'm sorry? How do we know that? Or how does the defense attorney know that if it was not provided to the defense attorney? Because it was provided in camera to Judge Anello, Your Honor, who reviewed it. And who also. No, but he can't. I mean, if he had said this contains sensitive information and I'm sealing it and that's why we're not providing it and in addition it's cumulative, I could see that. But if it's potential braiding material, I can't see withholding it just because the judgment decides it's cumulative. And I would have to go back, Your Honor, to that particular page of the transcript to determine if anything was said in that regard. My honest recollection is that it was cumulative. I think I saw that. I didn't interrupt you, Your Honor. I'm sorry. You filed it in camera and that was out of a concern for what? It was out of a concern from the government's view that the remainder of the defense was entitled to cross-examine Macedonia Guerrero about the fact that he lied during the safety valve interview. Sure. No, I understand that that's the government's position that everything that the defense was entitled to, they basically received through the sentencing memorandum.   Guerrero. I know that the government has to cross-examine the specific instances during which Guerrero previously lied to the government. Yes. But I just want to understand procedurally what happened in terms of that filing. So the prosecution reviewed the PSR, decided that all of the information that would be discoverable was already contained in what you previously produced and so out of an abundance of caution, decided to then submit it in camera? Was that what happened? Yes, essentially that is what happened, that any additional material other than the determination upon review of it was that all the potential Giglio or Brady material that was contained in the pre-sentence report was entirely cumulative of the material that was already provided to the defense and that we submitted it to Judge Anello in camera to ensure that we had made a correct determination in that regard and that we weren't missing something. And that's the procedure that was followed. But the basis of this ruling on page, on ER 1078, is he talks about how he looked through it to see if there was James Sackter Brady material which would have to be provided and then he looked at the government's sentencing memorandum which he thought, he decided the government's sentencing memorandum was a complete summary of everything said. So even if it did qualify as presumably James Sackter Brady material, it is clearly cumulative. But he's saying it's cumulative of the government's sentencing memorandum and it seems to me that the defense should be able to see if the Jenks or Brady material, regardless if it's cumulative, and be able to argue with the judge over whether it's cumulative or not and not be forced to rely on the government's sentencing memorandum. Your Honor, my understanding of this Court's precedent is that we did the right thing and that was where there was any question about I think you did do the right thing. I'm thinking the judge didn't. I respectfully disagree with that because the judge has the ability You did the right thing. I have no question that you did the right thing. I respectfully disagree with the issue that the judge may have not done the right thing. The judge reviewed it in camera and I do believe, or at least not cited in the briefs before this Court because it's not really raised as an issue is, and we haven't had the opportunity to brief it if it's a concern, is whether the Court was obligated to turn it over to the defense or whether the Court did the right thing by looking at it in camera. You threw it to the judge to compare what you produced with the PSR to determine whether there was anything in the PSR that would differ than what had been produced in the defense. But the alternative would have been for the prosecution to redact and turn over the substance of what you deemed to be repetitive but at least let the defense take a look at it so they can determine whether there are differences. I think this is where DOJ prosecutors then get in trouble for discovery issues because you make those calls and it turns out that there are differences that defense could get some traction out of that may not be anticipated by the prosecution. And I understand that, Your Honor. And in this case, when the request was made during trial to produce the presentence report, we believed then, as we do now, that the appropriate response was not to simply say no but to allow the Court to make that determination. And we respectfully do stand by that. I would add, with respect to the issue about cross-examination of Macedonio Guerrero, there was no limitation on the defense's ability to cross-examine him when the Court expressed a tentative view that perhaps going into every detail I believe might be an issue under Rule 608B. The Court was very clear. I will hear from the defense on that. And the defense response was, well, I intend to – I don't intend to go through the memorandum line by line, but I certainly intend to spend some time on it. And the response by the government was, that is appropriate impeachment. We take no issue on that. And everyone was in agreement. Although, to be precise, when you say there was no limitation, it seems to me from my review of the record that there was no question that the defendant tried to ask that was not allowed by the trial court during the trial. There was, however, at least the way I hear the argument by the defendant, there was the limitation in that the defense was not given the copy of the presentence report information so that they could then formulate other questions that may be based on that that might not be otherwise apparent from the sentencing memorandum. At least that's how I understand their argument. That argument, I guess I understand what Your Honor is saying. I do agree that that was the procedure that was followed. But I'm not sure that that's the defense argument because that really isn't an issue that was ever raised on this appeal. It is not one of the eight issues that's before the Court. It wasn't briefed by either party. The issue raised is whether the district court disallowed cross-examination of Mr. Guerrero, and that just did not happen. You know, speaking of cross-examination, let me turn to another issue that was expressly raised. Did the district court err by excluding the double-blind identification procedures cross-examination of Special Agent Stokes? No, Your Honor. Why not? For this reason. First, with respect to the applicable standard of review, under Federal Rule of Evidence 103, there was no offer of proof provided as required. And the standard of review is plain error. Now, I understand that the assertion is made by my colleague, well, this was obvious to everybody. Well, quite frankly, no, it wasn't. I had no idea what he was talking about. And apparently from the Court's comments, although it's not clear because the defense never provided an offer of proof, the Court wasn't, didn't have any idea either. I think the comment was maybe this is some other procedure. So I think it's unfair and incorrect, an incorrect inference from the record to assume that everybody knew exactly what the defense was talking about. But more fundamentally, double-blind is a label. And that's really all that it is. It – what was important here and what happened here is that both Border Patrol Agent Sandoval and FBI Special Agent Stokes testified regarding the six-pack photo lineup itself and the procedures that were followed on January 23, 2008, when Agent Sandoval reviewed the lineup. And although it is not in the ER, if you look at the SER at pages, I believe it is 12 and 13, there were very detailed admonitions provided by Special Agent Stokes to Agent Sandoval. And Special Agent Stokes did testify on direct examination. I provided him with these admonitions and I watched him because that is my practice, is to watch people as they review a photo lineup to do my best to ensure that they're actually looking at it. And Agent Sandoval, with no provocation from Agent Stokes whatsoever, selected photograph number one as looking similar to the driver of the Hummer. There was no limitation on questioning of either Agent Sandoval or Agent Stokes regarding anything that was said or done during the photo lineup. And to the extent there's an issue behind the double-blind, it's that I understand the defense point as well. Maybe sometimes the interviewing agent will do something or say something that will taint the lineup. But the fact is there was no evidence of that here. And there was every opportunity for both the government and the defense to inquire into that. And that's precisely what the government did on redirect examination when the defense asked Agent Stokes, the FBI agent, well, you knew that photograph number one was a suspect. Yes, I did. And on redirect, the government asked, did you do anything to indicate that to Border Patrol Agent Sandoval? Answer, absolutely not. So what specifically was the question to Special Agent Stokes on cross-examination that the Court did not allow? The question on cross-examination was, and I will cite Your Honor, well, to the testimony of Agent Stokes, which begins on page 551 of the SCR. It was, are you familiar with what is called a double-blind? And the objection was relevance. It was sustained. And then the defense counsel asked for an opportunity to inquire, were you aware of this procedure in January 2008? Answer, no. So the Court did allow the defense to ask that additional question. But the fact that he wasn't aware of it in 2008, I mean, what does that have? Why does that end the matter? If he was familiar with it now and familiar with the problems that come about when you don't have double-blind identification procedures, why isn't that a fair inquiry on cross-examination,  that generally limit expert testimony on these issues because there's broad cross-examination allowed? Understood. And to answer the first part of your question, it was, of course, the defense counsel's question as to whether Agent Stokes was familiar with it at the time. That was the choice of defense counsel to ask that question, whatever import it may have had. I thought the question was, are you familiar with double-blind? And then that was the question, objection sustained. Yes. And then the follow-up question that was allowed is, well, did you at least know about it back then? No. Yes, and I'm sorry if I mixed those two up. I apologize. All I was saying is that was you asked what's the import of that. Did you know about it then? I just don't know because that was the defense counsel's question is all I was trying to say. I think that the answer to your question is perhaps it might have been relevant had any explanation been provided to the district court and to government counsel as to what it was. And we had no idea, which is precisely what I'm saying. I don't understand how people had no idea of that. I mean, this whole subject of eyewitness identification has been under scrutiny for a long time now, people finding it very suspect, especially when it's fleeting moments and suggestive lineups and unconscious signaling. They've all been talked about quite a bit for a while. Perhaps I have to include myself in the group who did not know that term of art. And to be clear. Well, because it's pretty common police practice, even with the FBI that the agent who pulls the photos to put together the photo spread is generally the one going out in the field to conduct the photo spread with witnesses, right? Or at least at that time. It is. And, in fact, as the Court may be aware, there's been an interesting series of articles in Los Angeles Times about that very topic. In, I believe, August of this year. And, yes, some police departments have, now that I know what it is, changed their practices to reflect that. Many have not. And in this particular case, every single witness who testified regarding an identification was questioned. And there was no limitation placed upon counsel's ability to question about what was actually done. Because there has to be something suggestive. Now, to be clear. But there was limitation on what the implications would be of the way in which it was done. Namely, not doing it double blind. There was no ability to inquire of Special Agent Stokes of, you know,      I think that's a very important point. And I think that's a very important point. But don't you see the problems of doing it that way? And there could have been some relevance to that. I understand Your Honor's point. If there had been an offer of proof, which there was not. And I would say – I'm sorry. I think where that takes you. Tell me if you disagree, though, with this. There would not be a basis to overturn the conviction based upon this. For the fact that everyone was allowed to ask both Special Agent Stokes and Agent Sandoval, tell us what happened. Tell us what you did. Tell us what you saw. To the extent there was any gestures – this was testified, it did not happen – any pointing at a photograph, anything that was discussed in the Los Angeles Times article where a witness said, I think it's number three. And the detective there said, well, you keep looking at number four. Why do you keep looking at number four? And then they showed the witness a picture of number four. All of that was fair game. And the clear testimony was it never happened. The whole problem with subconscious influence or unconscious influencing is that the person's not conscious that they're doing that influencing. And that's a fair subject of cross-examination, maybe even someday for expert testimony, but certainly for cross-examination. Perhaps I would respectfully suggest not on the record before this Court in light of what was done with respect to these witnesses, what inquiry was allowed, and with respect to either a plain error or a harmless error analysis given the weight of the evidence that was presented over the course of the trial. Okay. Can I just ask a question about the verdict form? Sure. Because I find it confusing. Okay. The verdict form, the way it reads, number two says, guilty of, and here's the word, second-degree murder of Border Patrol agent Louis Aguilar as charged in count three of the indictment. And then you go to the alternative, and it does say lesser-included offense, but it also uses all the other same words, in count three, second-degree murder of Border Patrol agent Louis Aguilar. Do you agree with me that it would have been more clear to say of the lesser-included offense of involuntary manslaughter in count three instead of second-degree murder? Because it's not second-degree murder if it's involuntary manslaughter. So isn't that a wrong statement of the lesser or a wrong descriptor of the lesser-included offense? I understand Your Honor's question to have two parts. One, could it have been drafted more perfectly? Well, it's not even really that. And second, whether it's correct. But it's not really an alternative. You're saying second-degree murder both times when really the other, the alternative was involuntary manslaughter, not second-degree murder. Well, I don't think that we can look at the verdict form in a vacuum, and this Court has made clear. Well, I know you look at the instructions too, but the instructions aren't really all that clear either. Well, they follow this Court's – they are this Court's model instructions. I know they are. And I would respectfully disagree with the proposition that they are not clear. There was the second-degree murder instruction that was provided. Then this Court's model instruction. Actually, in fact, you know what? I want to think about that. I think you may be right because the verdict form didn't track the instruction because the instruction does use the language involuntary manslaughter. Right. But I think the clarification really may come in during Instruction 23, which says the crime of second-degree murder also includes the lesser crime of involuntary manslaughter, and then it instructs the jury to first look at whether the defendant is guilty of second-degree murder. And if the jury says not guilty on that, then they move on to the question of whether the lesser crime of voluntary manslaughter is met. So I think you have to read it together, correct? No, you do. But the thing that I think is confusing in that is that, for me, if you define second-degree murder as including involuntary manslaughter, which you've already defined as having a lower mens re, recklessness, instead of extreme recklessness, and you read that first thing, I don't know whether the jury decided extreme recklessness or recklessness because they're both second-degree murder. No. That is not a correct statement of the law. And may I answer that? Absolutely. I'm over my time, but if I understood Your Honor. I don't mind you telling me how I'm wrong. Oh, no, no, no. May I answer the question? I think this is a very important point that counsel raised at length. Yes. With respect to the issue of second-degree murder versus involuntary manslaughter, it is correct that the distinction can be one of degree. Now, second-degree murder is an unlawful killing with malice of forethought. And malice of forethought is defined in this circuit's model instructions as required by this circuit's precedent as a killing that is done deliberately and intentionally or recklessly with extreme disregard for human life. Now, the government's position at trial was that this was a deliberate and intentional killing. That was consistent with the evidence. It was consistent with the defendant Navarro-Montez's two oral and written statements that he chose to run over Border Patrol Agent Aguilar. But leaving that aside, this Court held in United States v. Lesnick, as cited in our brief, that that is a question for the jury to determine whether a particular set of facts shows reckless disregard or a higher level of extreme disregard. And one of the examples I would pose to the Court, this Court cited most recently in Pineda-Dovall, a case that I didn't even respond to in 28J because it is so readily distinguishable. One example, I believe it's Nessel Road v. United States from the District of Columbia Circuit in 1941 that's still cited, is driving a car at high speeds down busy city streets. And I would submit to this Court that the evidence presented to the jury, where you have an unobstructed view of Agent Aguilar directly in front of the Hummer driver, and we included in Volume 1 of our SCR those photographs taken from 100, 200, all the way to 500 feet away, which show that unobstructed view, the absence of any braking whatsoever, no slowing down, no braking approaching Agent Aguilar. The fact that this Hummer did not strike a glancing blow. This Hummer hit Luis Aguilar head on. In fact, the receiver hitch in the middle of the Hummer's bumper, as Agent Aguilar turned but didn't have time to take a step, it hit him square in the thigh. And at SCR, I believe it's 20 to 23, you have the photographs which show that pattern bruising, that the receiver hitch left on his leg as it hit him square on. And in fact, Agent Aguilar had a fractured femur 23 inches above the ground, above the ground on his leg, which corresponds exactly to the height of that receiver hitch. This wasn't a glancing blow. This wasn't as though somebody swerved and tried to correct. He ran, the defendant ran Agent Aguilar over head on. Beyond that, there was no braking afterward. Why does the video stop before you actually see the accident? It doesn't stop. It wasn't filmed. Why was all this other stuff filmed and that wasn't filmed? The testimony, and it was Border Patrol Agent Villareal, was that he's sitting in a camera room at the Calexico Border Patrol Station operating a number of cameras. And when the call went out over the radio that a Hummer was following in the same path of travel as the red Ford truck, and that the Hummer had been turned around in the median of Interstate 8, Agent Villareal testified he was trying to find it. You're manually operating a joystick with a camera mounted on a big pole located approximately a half a mile away from the T-intersection, and he tried to find it. He couldn't. In fact, the first time that he was able to find the Hummer was after it had hit Agent Aguilar and was speeding westbound on the frontage road. And that is the video footage. Again, this is just an inadvertent mistake in the opening brief. After the Hummer hit Agent Aguilar, it came up on the three-vehicle caravan, and the video shows the Hummer passing the last vehicle on the passenger side, cutting in front of it, coming into oncoming traffic, and passing the first two vehicles. And that's where the Hummer was coming head-on at John Johnson and Ray Murillo in their BLM pickup truck. Those are the other two witnesses who identified him. Agent Villareal testified, Your Honor, that after, days later, in reviewing the footage that had been taken, he realized that he had, in fact, inadvertently, the video had captured the Hummer as it was about to exit from the freeway onto Grayswell Road, but they didn't know it at the time. And, in fact, as the camera is panning, one can see in the very far distance, and it's difficult to make out, but a plume of sand that is presumably the Hummer entering the sand after it runs over Agent Aguilar, but all one can see in the background is a tiny plume of sand. The video footage did not exist, and that was the testimony of Agent Villareal. All right. Thank you. You're well over your time. Yes, Your Honor. I think you're over your time, but I'll give you a minute or two. You have two minutes. You have two minutes. Oh, okay. You've got your two minutes. Okay. I have three quick points, Your Honor. You can see what I mean. A very fine attorney, but you can't change the fact that in the opening brief on page 25, Mr. Navarro-Montes asked for the ability to cross-examine Mr. Guerrero about the specific lies he told regarding the 2002 case. That's at ER 2-171-72. That's when Mr. Robinson stands up and says no, 608, and the court adopts that rule. He tries to get into the specific lies. He's disallowed. Second thing, about the statements in Mexico. There were two statements. In the second statement, Mr. Navarro-Montes, according to the confession, saw Agent Burgoyne, and I don't know if I'm pronouncing that right, coming across his field of vision and that he was swerving to avoid him, which really supports the notion that he wouldn't expect that there would be someone else on the other side. And the final thing, with respect to cross-examination, Your Honor, Judge Simon hit it on the head when you said that we're supposed to have latitude with respect to cross-examination on eyewitness IDs. That's the reason we don't get experts. The court's case law, the rationale is you don't get an eyewitness expert because you have such an open right to cross-examination. But we didn't have it in this case. It wasn't a fair trial. Maybe they get them after a fair trial, but that's what should happen. Thank you, Your Honors. Thank you, counsel. United States v. Navarro-Montes is submitted, and this session of the court is adjourned for today.
judges: Simon, Wardlaw, Nguyen